BARNEY NASH v. E. D. VAUGHN, as Chief of Police of the City of St. Petersburg.

182 So. 827.

Opinion Filed July 18, 1938.

500

*L. P. Hardee* and *Raney H. Martin*, for Petitioner;

*Carroll R. Runyon, Lewis T. Wray,* *Harry I. Young, Arthur R. Thompson* and *Frank M. Harris,* for Respondent.

BROWN, J.—The above cause is before the Court on writ of habeas corpus issued by this Court directed to E. D. Vaughn, as Chief of Police of St. Petersburg, and his return thereto. Petitioner was arrested for a violation of Ordinance No. 789-A on a warrant, issued by the Judge of the Municipal Court. The sole issue is the validity of the ordinance in question, which, omitting the caption, is as follows:

"Section 1. That from and after the passage of this ordinance, it shall be unlawful for any person, firm or corporation to take any fish from the waters within the corporate limits of the City of St. Petersburg, with any gill net, seine, drag net or by stopping the course of any waterway (cast nets be excepted.).

"Section 2. Any person violating the provisions of this ordinance and after conviction therefor, shall be fined in

a sum not exceeding $200.00 or confined in the jail of said city not exceeding 90 days, either or both, in the discretion of the Judge of the Municipal Court trying said case.

"Section 3. It is further ordained that all ordinances or parts of ordinances in conflict with the provisions hereof, be and the same are hereby repealed.

"Passed on its first reading the 4th day of December, A. D. 1933.

"Passed on its second reading the 11th day of December, A. D. 1933.

"Passed on its third and final reading the 18th day of December, A. D. 1933."

The warrant alleges that "Barney Nash did unlawfully from the waters of Boca Ceiga Bay within the corporate limits of the City of St. Petersburg take fish by the use of a gill net," contrary to Ordinance 789-A, Section 1.

Petitioner contends that the ordinance aforesaid is invalid for two reasons: (1) That the City of St. Petersburg has no specific charter power enabling it to enact such an ordinance or to regulate the taking of fish within its corporate limits and that the broad general powers granted by the charter are not sufficient to enable the city to pass this ordinance; (2) At least one week did not elapse between the first and second reading of the ordinance, as is necessary under the mandatory requirements of the Charter Act.

It is acknowledged that the City of St. Petersburg has no specific legislative power to enact or enforce the ordinance under attack, but respondent seeks to justify it under the exercise of the police powers granted to the City of St. Petersburg in the most general terms, see Chapter 15503, Acts of 1931, and further because the ordinance does not conflict with any State law.

In State v. Stoutamire, 131 Fla. 698, 179 So. 730, this Court, in discussing the ownership and regulation of fish, adopted the generally accepted view that:

" 'Fish are classified in the law, largely perhaps because of their migratory characteristics and want of a fixed habitat, as animals *ferae naturae*. Their ownership, while they are in a state of freedom, is in the State, not as a proprietor, but in its sovereign capacity as the representative and for the benefit of all its people in common; in other words, the right of property in fish, so far as they can be asserted before they are taken and reduced to possession, is common to all the people and cannot be claimed by any particular individuals.

*Upon this fact of public ownership rests to a large extent the governmental power of regulation of fishing.'* 11 R. S. L. 1015. See *Ex Parte* Powell, 70 Fla. 366, 70 So. 392."

And in the same case, text 733, it was stated:

"There is a real distinction and difference between the right of the State in its lands and personal property and its right in fish in the public waters of the State. In its proprietary property it has absolute rights. In fish in the public waters the State has a sovereign right primarily and essentially of preservation, conservation, and regulation for the people of the State, whose right is to take fish from the waters subject to the regulations imposed by the State for the benefit of the people of the State. People of the State may take fish from the public waters unless forbidden by law."

This Court has never doubted that the protection and regulation of the salt water fishing industry of the State is a proper subject for legislative activity and has always recognized that the Legislature may enact special or local laws for the protection of fish in this State. White v. State,

93 Fla. 905, 113 So. 94; Snowden v. Brown, 60 Fla. 212, 53 So. 548; Stinson v. State, 63 Fla. 42, 58 So. 722; Jones v. State, 93 Fla. 603, 112 So. 556; State v. Stoutamire, *supra*.

The regulatory power of the State over the fish within its borders being vested in its lawmaking body, the Legislature may, as it has been doing for many years, exercise its power by the enactment of statutes dealing with the subject, or, to a certain extent, it may delegate its power of regulation to a board or commission. Likewise the Legislature may delegate to a municipality the power to regulate the taking of fish within its corporate limits. It is contended by respondent that a municipality in the exercise of the general police powers granted it by the Legislature may enact such regulations for the protection of wild game and fish within its borders as may not be in conflict with general laws of the State, without *specific* authorization from the Legislature.

This Court has never considered the question here presented, and there appears to be but slight authority from the decided cases of other jurisdictions.

In the case of *Ex Parte* John C. Bailey, 155 Cal. 472, 101 Pac. 441, the California Supreme Court was considering a similar ordinance of the town of Santa Monica which prohibited the use of any fishing net within said town less than 1000 feet from any wharf, dock or pier located in said town. That Court did not decide whether the municipality had the power to regulate fish within its corporate limits without express authority from the Legislature, but gracefully sidestepped the question and decided that the purpose of such an ordinance was not for the preservation and protection of the fish for the benefit of the people of the State, but that its object was to make such wharves, etc., more advantageous for fishing with hook and line and

therefore it was clearly beyond the power of the town to enact.

It is stated in Farnham on Waters and Water Rights, Vol. 2, Section 401, page 1431:

"The Legislature has the right to confer upon a municipal corporation the power to regulate the fisheries within its limits. But except in private waters of which the municipality has the title, it has, in the absence of statute or custom, no title to, or exclusive control over, the fisheries within its limits."

And in 11 R. C. L. 1043, it is said:

"The fish swimming in the waters within the boundaries of a state belong to the people of the state, not to the residents of a particular municipality of the state, and therefore, where the state has not delegated to a municipality any power relative to the taking of fish within its limits, it can make no regulations affecting the common right of fishing in public waters."

In State v. Bunker, 57 Atl. 95, the Supreme Court of Maine, considering a municipal regulation, stated:

"It is equally clear that without legislative authority the inhabitants of a town have no power to adopt by-laws or regulations controlling the subject of seashore fisheries."

The Legislature has enacted a great many laws restricting and regulating the taking of fresh and salt water fish in the public waters of this State. See Sections 1826 and 1879, Compiled General Laws of Florida 1927. Also Sections 1902 to 1987 C. G. L.; Chapter 14511, Acts of 1929; Chapter 13799, Acts of 1929; Chapter 15636, Acts of 1931, etc.

Section 1826, Compiled General Laws (Chapter 6877, Section 1, Acts of 1915) provides.

"Ownership of Fish Vested in State.—All fish in the

rivers, lagoons, lakes, *bays,* sounds and inlets bordering on or connected with the Gulf of Mexico and the Atlantic Ocean, or in the Gulf of Mexico or Atlantic Ocean, within the jurisdiction of the State of Florida, are hereby declared and shall continue and remain the property of the State of Florida, and may be taken and used by citizens of this State and persons not citizens of this State, subject to the restrictions and reservations hereinafter imposed by this Article."

It is our conclusion that the Legislature, by enacting numerous special and general laws dealing with the conservation of fish and the regulation and restriction of salt water fishing in the public waters within the territorial jurisdiction of the State, clearly indicated that it did not intend that the charter Act of the City of St. Petersburg, and similar charters of other municipalities, granting ordinary police powers in general terms, should operate as a delegation to the cities of the power to regulate fishing, in that portion of bays, inlets, etc., that are within the corporate limits of a municipality. The City of St. Petersburg (nor its citizens) have no such proprietary interest in the fish swimming in Boca Ciega Bay, Tampa Bay or the Gulf of Mexico within the corporate limits of the town as would authorize the City to restrict by ordinance the catching of such fish in the absence of authority delegated to it by the Legislature.

It is a familiar rule of law in this State that any fair and reasonable doubt concerning the existence of a power which encroaches upon the liberty of the citizen is resolved against the municipal corporation. State v. Lewis, 55 Fla. 570, 46 So. 630; State v. Burr, 79 Fla. 290, 84 So 61; Galloway v. Tavares, 37 Fla. 58, 19 So. 170; Jacksonville Elec. Light Co. v. Jacksonville, 36 Fla. 229, 18 So. 677; *Ex Parte* Davidson, 76 Fla. 272, 79 So. 727; Malone v.

Quincy, 66 Fla. 52, 62 So. 922. And courts will not enforce a doubtful municipal power. State v. Fowler, 90 Fla. 155, 195 So. 733. This rule would be all the more applicable if the particular power claimed by the city would infringe upon the common rights of the citizen theretofore existing and long recognized.

While it may be highly desirable and advisable for the City of St. Petersburg to maintain its piscatorial advantages as an inducement to winter visitors, and while as individuals the members of this Court might be entirely sympathetic with any movement having for its object the conservation of fish and wild game of all kinds, nevertheless we must hold that until the Legislature delegates to a municipality the power to regulate and protect fishing within its corporate limits, we cannot hold that the municipality has the power to exercise that authority. As Mr. Justice Cockrell aptly said in *Ex Parte* Perry, 71 Fla. 250, 71 So. 174: "Courts are established to apply the law, not to make it."

As the power to regulate the taking of fish out of the public waters of the State was not granted to the municipality by its charter, and such power is not necessarily or fairly implied, or incident to the powers expressly granted, nor essential to the declared objects and purposes of the corporation, the *ordinance* is unauthorized and invalid.

Having decided that the city did not have the power to enact this ordinance, it is unnecessary to decide whether or not such ordinance was passed properly. However, it appears from the briefs that the question raised is one of public interest in the City of St. Petersburg, inasmuch as most of the ordinances of that municipality have been passed in the same manner as the ordinance here under consideration; and so it may be advisable to discuss briefly this question.

The Charter Act, Chapter 15,505, Special Acts of 1931, provides that "no ordinance shall be passed until it has been read in open council meeting three times. *Between the first and second reading at least one week shall elapse."* Ordinance 789-A shows that it was read the first time on Monday, December 4, 1933, and the second time on Monday, December 11, 1933. Petitioner contends that at least one week did not elapse between the first and second reading of the ordinance and in support of this contention he cites Hodges v. Filstrup, 94 Fla. 943, 114 So. 521:

"When the word 'between' is used with reference to a period of time, bound by two other specified records of time, such as between two days named, the days or other periods of time named as boundaries are excluded. Winans v. Thorp, 87 Ill. App. 297, 298; Fowler v. Rigney, 5 Abb. Prac. (N. S.) (N. Y.) 182, 184; Cook v. Gray, 6 Ind. 335, 337; Bunce v. Reed, 16 Barb. (N. Y.) 347, 352; Robinson v. Foster, 12 Iowa, 186, 188. The word 'between,' when used in speaking of the period of time 'between' two certain days, generally excludes the days designated as the commencement and termination of such period." (Citing cases.)

This Court was construing, in the above case, a statute prescribing a closed season on mullet between the first of December of any year and the 20th day of January of the next succeeding year. It is apparent that the closed season was that period of time between the two dates.

The case cited is not in point, as counsel for petitioner overlooks the fact that the charter Act here involved does not provide that two weeks must elapse between two particular days, but the lapse of time is between the *readings* of the ordinance.

In the case of New York Life Insurance Co. v. Bullock, arising in Ocala, Florida, 26F (2nd) 666, the United States

Circuit Court of Appeals for the Fifth Circuit somewhat recognized this distinction:

"In construing a statute or contract where computation of time to be made from a specific day *and not from the occurrence of an event on that day,* the first day must be excluded; the word 'from' excluded the day of the date."

The case of Fehler v. Gosnell, 99 Kentucky, 380, 35 W. 1125 is closely in point:

"By Section 2834 Ky. St. (a section of the Act for the government of cities of the first class) it is provided that 'no ordinance for any original improvement mentioned in this case shall pass both boards of the general council at the same meeting, and *at least two weeks shall elapse between the passage of any such ordinance from one board to the other.'* In the case of Fehler v. Gosnell, the ordinance providing for the improvement passed the lower board on April 5, and the upper board on April 19, 1894; and the appellants contend that two weeks did not 'elapse' between the votes of the two boards, within the meaning of the statute. It is earnestly contended by counsel for appellants, and much authority from other states cited in support of their position, that the intent of the statute was to provide for 14 full days between the days of the passage of the ordinance of the respective boards. But this contention does not seem to us to be supported either by the ordinarily accepted use of the language, or by the statutory rule of construction of this State. In ordinary language, a provision that two weeks must elapse between two acts would be considered as fulfilled by the first act occurring Thursday and the second act occurring Thursday two weeks thereafter. Moreover, Section 453, Ky. St., provides that, 'if a statute requires a notice to be given, or any other act to be done a certain time before any motion or proceedings, there must be that time, exclusive of the day for such motion or proceeding; but

the day on which such notice is given, or such act is done, may be counted as one day and part of the time.' It.is to be observed that the time required by Section 2834 of the statute is between the passage by one board and the passage by the other, and is not between the day on which it is passed by one board and the day on which it is passed by the other. Without undertaking to answer in detail the ingenious argument of counsel for appellants, it is sufficient to say that, in our opinion, the statute requires only that the passage by the first board shall be 14 days before the passage by the other board, and that, in this case, that provision has been complied with."

The Florida Rule for computation of time generally is Common Law Practice Rule 5. See also Anderson Mill and Lbr. Co. v. Clements, 101 Fla. 523, 134 So. 588; Croissant v. DeSoto Imp..Co., 87 Fla. 530, 101 So. 37; Simmons & Capen v. Hanne, 50 Fla. 267, 39 So. 77; Savage & James v. State, 18 Fla. 970.

As it is pointed out in Vol. 2, McQuillin's Municipal Corporation, 2nd Ed., page 634:

"The purpose of requiring the ordinance to be read at more than one session or meeting is to prevent undue haste and secure deliberation by the legislative body before its final passage."

We are of the opinion that two weeks "elapsed" between the first and second reading of the ordinance and the Charter Act was complied with in this respect.

However, for the reasons above pointed out, we must hold the ordinance invalid, and accordingly it is ordered that petitioner be discharged from custody.

Ellis, C. J., and Whitfield, Buford and. Chapman, J. J., concur.