573 So.2d 932 (1991)
Richard M. BARRY, Individually, and As Chairman of the Ad Hoc Independent Review Panel of the City of Miami, Elmira Brown, Lt. Franklin E. Christmas, Officer Jorge F. Coladas, Leroy Colyer, Sgt. Alphonso Erving, Annie Gooden, Officer Herma V. Justice, Dewey W. Knight, Officer David A. Magnusson, and Rev. Willie Starks, Appellants,
v.
Martin GARCIA, Individually, and As President of Hispanic Officers Association, Albert Pamareiga, a Police Officer with the City of Miami, Appellees.
No. 89-1784.
District Court of Appeal of Florida, Third District.
January 15, 1991.
*933 Harold Long, Jr., Miami, for appellants.
Klausner & Cohen and Robert Klausner, Miami, for appellees.
Jorge L. Fernandez, City Atty. and Albertine B. Smith and Kathryn S. Pecko, Asst. City Attys., for City of Miami, as amicus curiae.
Before SCHWARTZ, C.J., and BARKDULL and JORGENSON, JJ.
BARKDULL, Judge.
Appellants, the Chairman and members of the Ad Hoc Independent Review Panel of the City of Miami, appeal a final order discharging an order to show cause and dismissing a petition for contempt with prejudice. We find no error in the trial court's determination that the City Commission of the City of Miami had no authority to grant subpoena power to an independent investigatory body, consisting of nonelected officials.
On January 18, 1989, the Ad Hoc Independent Review Panel was created by the adoption of Resolution 89-84 by the City Commission of the City of Miami and was charged with the responsibility of "(a) investigating and reviewing community relations between police officers and the residents in the Overtown area and (b) reporting its findings and making its recommendations to the City Commission ..." The Ad Hoc Independent Review Panel was created by the Miami City Commission as a result of and response to civil disturbances that occurred within the city limits in January 1989.[1] Section 3 of Resolution 89-84 *934 purported to grant subpoena power to the investigative panel "to the extent permitted by law ..." Subsequently, the Ad Hoc Independent Review Panel issued subpoenas to Martin Garcia, President of the Hispanic Officers Association of the City of Miami and Albert Pamareiga, a City of Miami police officer, directing them to appear before it and give testimony pertinent to the causes of the civil disturbances in Overtown. Both Garcia and Parmareiga refused to testify and did not appear at the scheduled place and time.
Thereafter, the Ad Hoc Independent Review Panel filed a petition requesting the court to, (1) require the respondents to show cause why they should not be adjudged guilty of and punished for contempt as a consequence of disregarding the subpoenas, and (2) adjudicate the respondents guilty of contempt, but give them an opportunity to purge themselves of contempt by appearing before the Ad Hoc Independent Review Panel and rendering testimony in accordance with the subpoenas. The trial court issued an order to show cause and found, inter alia, "[t]hat by Resolution 89-84 of the City Commission of the City of Miami, the Ad Hoc Independent Review Panel was given subpoena powers to conduct an investigation for, and on behalf of the City Commission."
The respondents then filed a response to the order to show cause and moved the trial court to transfer the cause to another division of the circuit court, where there was a case pending that sought a declaration that Resolution 89-84 was invalid, to the extent it granted subpoena power to the Ad Hoc Independent Review Panel. An order was entered transferring the cause to the requested division of the circuit court and a hearing was held on the contempt petition.
At the hearing the respondents argued that the elements of contempt had not been established as a matter of law; that general administrative investigatory subpoenas were disapproved in the law; that the City Commission's attempt to delegate subpoena power to the Independent Review Panel was unlawful; that the city charter, as amended, expressly authorized only the City Commission and the Civil Service Board to issue investigatory subpoenas; that creation of the Independent Review Panel via resolution was an insufficient legislative act; that the subpoena power violated the collective bargaining agreement between the City of Miami and the Fraternal Order of Police; and that the Independent Review Panel lacked standing to bring this case.
In response the Petitioners argued that the subpoena power was lawfully delegated to the Ad Hoc Independent Review Panel in accordance with provisions of the Florida Constitution, the Municipal Home Rule Powers Act (Ch. 166, Fla. Stat.), and the Miami City Charter, Section 3(y).
After review of the record, hearing argument of counsel, and consideration of the cited authorities, the trial court entered an order discharging the order to show cause and dismissing the petition for contempt, with prejudice. In so ruling, the court found that as a matter of law, the Ad Hoc Independent Review Panel did not have the authority to issue subpoenas and to compel attendance of witnesses to its proceedings.
The appellants and the amicus curiae point to Article VIII, Section 2 of the Florida Constitution (1968), and Section 166.021(1), (4), Florida Statutes (1987), as giving the city the power to enact the resolution in question and make the delegation of *935 subpoena power, because the legislative action meets both the municipal purposes test and was not expressly prohibited by the constitution, either general or special law, or county charter. City of Boca Raton v. Gidman, 440 So.2d 1277 (Fla. 1983); City of Winter Park v. Montesi, 448 So.2d 1242 (Fla. 5th DCA), review denied, 456 So.2d 1182 (Fla. 1984). We first note that Article VIII, Section 6(e), Florida Constitution (1968), specifically exempts Dade County and all municipalities therein, from the provisions of Article VIII, wherein it is precisely stated: "as if this article had not been adopted".[2] Municipalities in Dade County are controlled by the provisions of Article VIII, Section 11, of the Florida Constitution of 1885, as amended in 1956, plus the provisions of the Metro Charter, until such time as the "county shall adopt a charter or home rule plan pursuant to [Article VIII of the Constitution of 1968]." This event has not occurred since the effective date of the 1968 Constitution.
The Home Rule Amendment was approved by the voters of Florida, in November, 1956. On May 21, 1957, the Home Rule Charter provided for in the amendment was approved by the electorate of Dade County and became effective sixty days thereafter. The Home Rule Amendment granted county government power over local affairs within Dade County, but it required Dade County to provide a method whereby the municipalities would have the power to make, amend, and repeal municipal charters. This power was formerly vested solely in the legislature, Article VIII, Section 11(g), Florida Constitution (1885), but in Dade County, that exclusive power has now been limited by the adoption of the Home Rule Amendment (1956), which specifically vests such power in the municipalities. Article VIII, Section 11(g) of the Florida Constitution of 1885 as amended, states in pertinent part that Dade County "[s]hall provide a method by which each municipal corporation in Dade County shall have the power to make, amend or repeal its own charter." The Florida Supreme Court noted in its first interpretation of the Dade Home Rule Charter that:
As part of the same subsection (Article VIII, Section 11(g)) it should be pointedly noted that the Constitution provides that upon the adoption of the home rule charter, "this method" (the method which the charter provides for municipalities to make, amend or repeal their charters) "shall be exclusive and the legislature shall have no power to amend or repeal the charter of any municipal corporation in Dade County."

Dade County v. Dade County League of Municipalities, 104 So.2d 512, 517 (Fla. 1958).
The stated objective of the home rule legislation was to transfer the power the legislature had in passing local bills and special laws applicable only to Dade County, from the state to the Dade County Board of County Commissioners, and hence on to the municipalities.[3]
*936 The drafters of the Metropolitan Dade County Charter, as they were constitutionally required to do, provided a method whereby each municipality in Dade County could adopt, amend or revoke a charter for its own government. Metropolitan Dade County Charter, § 5.03(A). Pursuant to Section 5.03(A), the governing body of a Dade municipality must: (1) either adopt a resolution or certify a petition of ten percent of the qualified electors, (2) draft an amendment in a method determined by ordinance, (3) which must then be submitted to a vote and approved by a majority of the electors voting.[4]
Our attention has been called to the following authority. State v. City of Miami, 379 So.2d 651 (Fla. 1980); City of Miami Beach v. Forte Towers, Inc., 305 So.2d 764 (Fla. 1974); Rolle v. City of Miami, 408 So.2d 642 (Fla. 3d DCA 1981). We note that only the Forte Towers case refers to the Constitution of 1968, and it permits general law to impact the municipal charter in Dade County only when the grant of power is in addition to those already held by the municipal corporation. See Forte Towers at 767, wherein the following is found.
[A]mendment to the city charter is not the only means by which additional powers may be conferred on a Dade County municipality. The Metro County charter section 5.02 provides that each municipality shall have the authority to exercise all powers relating to its local affairs not inconsistent with the charter.
City of Miami Beach v. Forte Towers, 305 So.2d 764 (Fla. 1974) The other two cases make no reference to the Constitution of 1968 as it effects municipalities authorized under the provisions of the 1885 Constitution as amended, which is the authority under which the City of Miami operates. Apparently this point was not presented to the appellate court.
Generally a municipality derives its power of subpoena in connection with its power to legislate, or when exercised, a quasi judicial power. When a municipal charter or special act grants the use of subpoena power and prescribes, if any, its manner of delegation, the specific delegation authorized is the only means available by the governing authorities to the exclusion of any general grant of power or authority. The Miami City Charter specifically prescribes the several methods of subpoena power delegation and it is a general rule, that specific requirements of a special act or charter, will control to the exclusion of a general grant of authority.
Florida adheres to what is known as "Dillons Rule", the traditional measure for determining the scope of local power under state enabling legislation.[5] Pursuant to "Dillons Rule", local governments may exercise only those powers "granted in express words," or "those necessarily or fairly implied in or incident to, the powers expressly granted," or "those essential to the declared objects and purpose of the [municipal] corporation  not simply convenient, but indispensable." See D. Mandelker, D. Netsch, & P.P. Salsich, State and Local Government in a Federal System: *937 Cases and Materials 83 (2d ed. 1983). The plain meaning of that doctrine is that the Florida municipal corporation is a creature of the state, and consequently, none may be created without the express authority of the state, nor is a municipality permitted to exercise any powers other than those granted directly by the constitution or authorized as valid by duly enacted general or special acts. The Florida Supreme Court clearly stated its adherence to this principle in Tampa v. Easton, 145 Fla. 188, 191, 198 So. 753, 754 (1940):
Unlike a county, a municipality is not a subdivision of the State with subordinate attributes of sovereignty in the performance of governmental functions and correlative limited privileges, immunities and exemptions for the negligence of its employees ... [It] is a legal entity consisting of a population and defined area, with such governmental functions and also corporate public improvement authority as may be conferred by law in a charter or other legislative enactment under the [Florida] Constitution.
Tampa v. Easton, 145 Fla. 188, 191, 198 So. 753, 754 (1940).
Another way of stating the general rule is that the express enumeration of the powers conferred on municipalities is an exclusion of all other powers not expressly delegated to them and which are not necessarily implied in those expressly delegated. Pensacola v. Fillingim, 46 So.2d 876 (Fla. 1950), rehearing denied. In Lachman v. Walker, 52 Fla. 297, 300, 42 So. 461 (1906), the Florida Supreme Court held that "[w]hile strict construction should be applied to the grant of powers to municipalities and especially those that result in public burdens, yet if the power is clearly implied, it should not be impaired by a strict construction. A strict construction must yet be a sensible construction and be based on the entire context." Lachman, id. 52 Fla. at 300, 42 So. 461.
As a general rule of statutory construction, the mention of one thing implies the exclusion of another. Thayer v. State, 335 So.2d 815 (Fla. 1976) (citing to Ideal Farms Drainage Dist. v. Certain Lands, 154 Fla. 554, 19 So.2d 234 (1944)). Specifically, where the exercise of particular powers may be fairly included in and authorized by general powers granted, the statutory construction rule, expressio unius est exclusio alterius, is not applied to exclude powers that serve the purposes for which municipalities are organized where such powers are consistent with other powers conferred and with limitations imposed by the charter or by statute upon the municipal powers. Southern Utilities Co. v. Palatka, 86 Fla. 583, 99 So. 236, 243 (1923), cert. granted 264 U.S. 580, 44 S.Ct. 454, 68 L.Ed. 859 (1924), aff'd, 268 U.S. 232, 45 S.Ct. 488, 69 L.Ed. 930 (1925).
The City of Miami Charter, Section 14, (a legislative enactment)[6] provides the aforementioned express grant, where it states in pertinent part that, "The Commission or any committee thereof, duly authorized by the commission so to do, may investigate ... the official acts and conduct of any city official, and by similar investigations may secure information upon any matter. In conducting such investigations the commission, or any committee thereof, may require the attendance of witnesses and the production of books, papers and other evidence, and for that purpose may issue subpoenas which shall be signed by the presiding officer of the commission or the chairman of such committee, as the case may be, which may be served and executed by any policeman". No other reference is made in the City of Miami Charter to the delegation of such investigative subpoena powers (except Section 36(i), pertaining to the Civil Service Board) to any other board, committee or agency, not comprised of city commissioners.
Coupled with the power to issue subpoenas is the power to enforce compliance *938 therewith.[7] Ultimately disobeying a subpoena lawfully issued can result in a contempt order by an appropriate judicial forum, which upon noncompliance, may result in the one subpoenaed being subject to incarceration. Regardless of whether a committee applies to a court for a subpoena or issues a subpoena on its own authority, as was the case here, it must apply to the courts for an order if it wishes to enforce a subpoena against a recalcitrant witness. In State ex rel. Greenberg v. Florida State Board of Dentistry, 297 So.2d 628 (Fla. 1st DCA 1974), it was held that:
[A] citizen may not be held in contempt and thereupon punished on failing or refusing to obey any subpoena, process, or order of any administrative agency until after he shall have first been afforded an opportunity for a hearing before a court of competent jurisdiction and until that court shall have ordered obedience to such subpoena, process or order and such court order shall have been disobeyed.
State ex rel. Greenberg v. Florida State Board of Dentistry, 297 So.2d 628, 632 (Fla. 1st DCA 1974).
Therefore, there must be a clear authority to either issue a subpoena by municipal officials in the first instance or for them to delegate this power to nonelected persons. If the city opts to change the manner in which subpoena power is to be exercised, including the power to delegate same to a citizen board such as the Ad Hoc Independent Review Panel, then such change must be accomplished in accordance with the provisions of the Charter and the Municipal Home Rule Powers Act; i.e., by a referendum of the electors of the city.
The creation of the review panel in the instant case, is not within the specific group that is authorized under the charter to receive subpoena powers, therefore the attempted delegation is unauthorized.
In addition to the above, the attempted delegation of power was by resolution, and not by ordinance. A municipal ordinance is defined as "[A]n official legislative action of a governing body, which action is a regulation of a general and permanent nature and enforceable as a local law." Sec. 166.041(1)(a), Fla. Stat. (1987). A municipal resolution is defined as "[A]n expression of a governing body concerning matters of administration, an expression of temporary character, or a provision for a disposition of a particular item of the administrative business of the governing body." Sec. 166.041(1)(b), Fla. Stat. (1987).
Upon the enactment of a resolution, citizens of the incorporated municipalities have no right to appear and no opportunity to be heard prior to the adoption of the resolution. However, upon the consideration of a municipal ordinance, the public is entitled to a notice and an opportunity to be heard.[8] Certainly, in a matter as important as delegating the power of subpoena to nonelected officials, such power, even if authorized in the first instance, (which we do not find), must be exercised by the municipal commission via a duly enacted ordinance.
The method by which an independent review board may exercise such a power might possibly be prescribed by resolution, Wallace v. Leahy, 496 So.2d 970 (Fla. 3d DCA), review denied, Leahy v. *939 Wallace, 497 So.2d 1217 (Fla. 1986), but not the delegation of subpoena power in the first instance. This court addressed that issue in 7800 Building, Inc. v. City of South Miami, 305 So.2d 860 (Fla. 3d DCA 1974), wherein it was held that change in a tax assessment formula, required by charter to be accomplished by ordinance, could not be accomplished by resolution. In 7800 Building, id. at 861, this court adhered to the language utilized by the Florida Supreme Court in Brown v. City of St. Petersburg, 111 Fla. 718, 153 So. 140 (1933), holding that "a resolution cannot be substituted for and have the force and effect of an ordinance, nor can a resolution supply initial authority which is required to be vested by ordinance." Generally, a city commission, which is a legislative body of a city, possesses no power to delegate their authority as prescribed in their charter. Municipal officials can only act in accordance with an express grant in their charter and not any implied grant of power. Tampa v. Easton, 145 Fla. 188, 198 So. 753 (Fla. 1940).
Accordingly, we affirm the judgment of the Circuit Court discharging the order to show cause and dismissing the petition for contempt with prejudice.
Affirmed.
NOTES
[1] From August 1968 through July 1979, there were at least thirteen significant civil disturbances involving violent confrontations between blacks and whites in Dade County, Florida, a significant percentage of which involved attacks on police officers. In the decade of the eighties there were three major civil disturbances in the City of Miami and there have been two to date in the nineties. On May 17, 1980, there was a major civil disturbance as a result of the acquittal of the police officers involved in the fatal beating of Arthur McDuffie and the subsequent cover-up. The McDuffie riots resulted in eighteen deaths and eighty million dollars in property damage. The second civil disturbance was sparked by the fatal shooting of Nevell Johnson, Jr. by officer Luis Alvarez, in an Overtown video arcade in December 1982, and again in March 1984, after Alvarez was acquitted. The third instance, and the one precipitating the creation of the investigatory panel under review, occurred on January 21, 1989, and was caused by the fatal shooting of a motorcycle rider, Clement Anthony Lloyd by officer William Lozano, that also resulted in the death of Allan Blanchard, a passenger on the motorcycle. This court takes judicial notice of the foregoing pursuant to Section 90.202(12), Florida Evidence Code, (1990), since they are facts not subject to dispute because they are capable of accurate and ready determination by resort to sources whose accuracy cannot be questioned.
[2] Section 166.021(3)(d), Florida Statutes, (1987), reads as follows: "The Legislature recognizes that pursuant to the grant of power set forth in § 2(b), Art. VIII of the State Constitution, the legislative body of each municipality has the power to enact legislation concerning any subject matter upon which the state legislature may act except: Any subject preempted to a county pursuant to a county charter adopted under the authority of art. VIII, §§ 1(g), 3, and 6(e), of the state constitution."

Section 6(e), Article VIII of the State Constitution, reads as follows: "CONSOLIDATION AND HOME RULE. Article VIII, Sections 9, 10, 11 and 24, of the Constitution of 1885, as amended, shall remain in full force and effect as to each county affected, as if this article had not been adopted, until that county shall expressly adopt a charter or home rule plan pursuant to this article. All provisions of the Metropolitan Dade County Home Rule Charter, heretofore or hereafter adopted by the electors of Dade County pursuant to Article VIII, Section 11, of the Constitution of 1885, as amended, shall be valid, and any amendments to such charter shall be valid; provided that the said provisions of such charter and the said amendments thereto are authorized under said Article VIII, Section 11, of the Constitution of 1885, as amended."
[3] The preamble to the Metro Dade Charter reads as follows: "We, the people of this County, in order to secure for ourselves the benefits and responsibilities of home rule, to create a metropolitan government to serve our present and future needs, and to endow our municipalities with the rights of self determination in their local affairs, do under God adopt this home rule Charter." (Emphasis added.)
[4] Section 5.03 of the Metropolitan Dade County Charter reads as follows: "(A) Except as provided in Section 5.04, any municipality in the county may adopt, amend, or revoke a charter for its own government or abolish its existence in the following manner. Its governing body shall, within 120 days after adopting a resolution or after the certification of a petition of ten percent of the qualified electors of the municipality, draft or have drafted by a method determined by municipal ordinance a proposed charter, amendment, revocation, or abolition which shall be submitted to the electors of the municipalities. Unless an election occurs not less than 60 nor more than 120 days after the draft is submitted, the proposal shall be submitted at a special election within that time. The governing body shall make copies of the proposal available to the electors not less than 30 days before the election. Alternative proposals may be submitted. Each proposal approved by a majority of the electors voting on such proposal shall become effective at the time fixed in the proposal.

(B) All municipal charters, amendments thereto, and repeals thereof shall be filed with the Clerk of the Circuit Court."
[5] See Dillon, Municipal Corporations 154, 155 (5th Ed. 1911); McQuillin, The Law of Municipal Corporations 592 (3d Ed. [Smith] 1949); Sutherland, Statutory Construction, (4th Ed. 1985).
[6] The present Charter of the City of Miami was reenacted by the Legislature during the 1925 session, as contained in Laws of Fla. (1925), ch. 10847, and has been amended at subsequent sessions of the Legislature and by the city's electorate pursuant to the provisions of § 5.03 of the Metropolitan Dade County Charter.
[7] Black's Law Dictionary, 5th Edition (1979), defines the term and word subpoena as follows: "Subpoena. A subpoena is a command to appear at a certain time and place to give testimony upon a certain matter. More specifically, this is a subpoena ad testificandum, (See also 3d ed.), which is defined as `the common subpoena' requiring the attendance of a witness on a trial, inquisition, or examination."

In re Strauss, 30 App.Div. 610, 52 N.Y.S. 392.
[8] "A resolution is an order of local government of a special and temporary character, while an ordinance prescribes a permanent rule of conduct of government." Certain Lots Upon Which Taxes Are Delinquent v. Town of Monticello, 159 Fla. 134, 144, 31 So.2d 905 (1947), rehearing denied; "The purpose of requiring that a proposed ordinance be read at more than one session or meeting is to prevent undue haste and secure deliberation by the legislative body before final passage." Nash v. Vaughn, 133 Fla. 499, 509, 182 So. 827 (1938). This distinction, which is applicable to counties, has been recognized and codified in Chapter 166, Florida Statutes.